**MANSFIELD v. HESTER et al. (HESTER et al., Third Party Defendants).**

**Civ. A. No. 873.**

United States District Court
S. D. West Virginia.

Jan. 11, 1949.

Ashworth & Sanders, D. D. Ashworth and C. Berkley Lilly, all of Beckley, W.

Va., for plaintiff and third party defendants.

Herman D. Rollins, of Charleston, W. Va., for defendant Lillie Hester.

Leslie E. Given, U. S. Atty., of Charleston, W. Va., for U. S.

BEN MOORE, Chief Judge.

Under the National Service Life Insurance Act of 1940, as amended, provision is made for the payment of remaining unpaid installments of insurance effected thereunder, upon the death of a named beneficiary. The sections which apply to this case are in part as follows:

Title 38 U.S.C.A., Chapter 13, § 802(h) (3):

"Any installments certain of insurance remaining unpaid at the death of any beneficiary shall be paid in equal monthly installments in an amount equal to the monthly installments paid to the first beneficiary, to the person or persons then in being within the classes hereinafter specified and in the order named, unless designated by the insured, in a different order—* * *

"(C) if no widow, widower, or child, to the parent or parents of the insured who last bore that relationship, if living, in equal shares;

"(D) if no widow, widower, child, or parent, to the brothers and sisters of the insured, if living, in equal shares."

Section 801(f) contains the following definition:

"The terms 'parent', 'father', and 'mother', include a father, mother, father through adoption, mother through adoption, persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year, and a stepparent, if designated as beneficiary by the insured."

Gordon Hester, Jr., unmarried, entered the United States Army in December, 1943. Soon afterwards he applied for and received a policy of National Service Life Insurance in the amount of $10,000, designating as beneficiary his grandmother, Julia Patton Hester, and stating in the application that she was a person in loco parentis to the applicant. He declined to designate any contingent beneficiary. He died while in the Army on April 17, 1946. On the following day, April 18, 1946, Julia Patton Hester died, without having been paid any of the proceeds of the insurance policy.

Gordon Hester, Jr.'s, father, Gordon Hester, Sr., died approximately three months before the son entered the United States Army. The mother of Gordon Hester, Jr., Lula Belle Mansfield, is the plaintiff in this suit. There are three living sisters, Dorothy N. Hester, and Ellen M. Mansfield, being sisters of the whole blood, and Mary Mansfield Matherly, being a sister of the half blood. Subsequently to the death of Julia Patton Hester, the Administrator of Veterans' Affairs awarded the proceeds of the insurance to Lillie Hester, insured's aunt, a defendant in this suit, pursuant to a determination that she was the person who last bore the relationship of "in loco parentis" to insured for more than one year prior to his entry into the United States Army. Lula Belle Mansfield has brought this action against Lillie Hester and the Administrator of Veterans' Affairs, seeking to obtain the proceeds of the insurance for herself as the natural mother of the insured soldier, and the three sisters are brought in as third party defendants, who would be entitled under the statute to take the proceeds in the event neither Lula Belle Mansfield nor Lillie Hester have a prior right thereto. The mother and sisters deny that Lillie Hester ever sustained the relationship of a person in loco parentis to the insured, and Lillie Hester, by her answer, maintains that she did stand in such relationship, setting up a series of alleged facts which she says fully sustain that conclusion.

The Court heard the evidence orally and by depositions. The following facts are established:

Gordon Hester, Sr., and Lula Belle Mansfield were never legally married. The latter separated from her husband in the year 1921, and has not lived with him since that time, although the husband is still living, and they have one child, Mary Mansfield Matherly. Early in the year 1925, Hester and Mrs. Mansfield began liv-

ing together ostensibly as husband and wife, while he was working at Dott, a mining town in West Virginia. Late in the year 1925 Gordon Hester, Sr., and Mrs. Mansfield went to the home of his mother, Julia Patton Hester, near Cleveland, Georgia, where he introduced her as his wife and where, shortly afterwards, Gordon Hester, Jr., was born. Besides Gordon Hester, Sr., Mrs. Mansfield, and their son, Gordon Hester, Jr., there were living in the home of Julia Patton Hester at that time her eighteen year old daughter, Lillie, and possibly one or two older children of Julia Patton Hester, although the record is not clear as to this.

A few months after the birth of Gordon Hester, Jr., his parents, with their child, left the home of his grandmother and returned to Dott, West Virginia, where they remained for about four years, during which time their second child, Ellen Marie was born. Gordon Hester, Sr., then took his son and returned to the home of his mother. He stayed only a short time, and then went back to West Virginia, leaving Gordon Hester, Jr., in the home with his mother and his sister, Lillie. Some vague references in the testimony indicate that another sister, Fannie, may also have been living in the home at that time.

From the year 1930 until he entered the United States Army, Gordon Hester, Jr., lived at his grandmother's home. About four or five years after he started living there, he had a serious illness, and at that time his father and his mother both came to visit and attend him, his mother remaining there about two months. Again, early in the year 1938, Mrs. Mansfield returned to Julia Patton Hester's home, and there in June of that year gave birth to her youngest daughter, Dorothy Nell Hester. Soon after the birth of this child, Gordon Hester, Sr., also returned to that home and never again lived at any other place. Mrs. Mansfield left the Hester home about the middle of 1939, taking with her her two daughters, and returned to West Virginia. She wished to take the boy, also, but Gordon Hester, Sr., insisted that she leave him, because he (Gordon, Sr.) could "do better by this boy than you can." She never afterwards visit-

ed or lived in the Hester home, nor did she see her son, Gordon Hester, Jr., again; but both she and her daughter Ellen Marie corresponded with him, infrequently prior to his entering the United States Army, but several times a week while he was in the Army and up to the time of his death. Letters written by him to his mother while in the Army show that the normal feelings of filial and maternal affection existed between the son and his mother. He made allotments from his Army pay to his grandmother and to his aunt, Lillie Hester, but none to Mrs. Mansfield.

In 1930 Julia Patton Hester was sixty-two years old and Lillie Hester was about 23. The older woman was not strong; but she did her housework, including the cooking, assisted by her daughter Lillie. The two of them ministered to the ordinary wants of Gordon Hester, Jr., such as cooking his meals, washing, ironing and mending his clothing, preparing his school lunches, counseling and advising him; and he seems to have been subject to the control and authority of both, without any specific understanding as to which one should direct his activities. When he went to church, his grandmother accompanied him. Gordon Hester, Sr., sent money at intervals for the general support of the family; and when Mrs. Mansfield was there in 1938 and 1939, she gave Julia Patton Hester money for the support of the family, which she had earned while working in West Virginia, and also bought some clothing for Lillie Hester.

Lillie Hester worked in the garden, did the milking (at least a substantial part of the time), raised chickens, sold chickens, eggs, butter and vegetables, and earned some small amounts of money by picking beans for neighboring farmers, out of the proceeds of which sales and work she contributed to the general expenses of the family and paid the taxes on the farm. She spent, over the whole period of time during which Gordon Hester, Jr., lived in the home, an amount not in excess of $50 for him personally. Occasionally she visited her relatives for short periods of time.

While Mrs. Mansfield was in the Hester home in 1938 and 1939, she helped with the

general house and farm work, and exercised parental control over her son, Gordon Hester, Jr. After she left there, about the middle of 1939, the boy's father became the principal wage earner, working in various nearby timber jobs and at farm work; and thenceforth until his death he exercised control and supervision over his son Gordon Hester, Jr., in all the ordinary relationships of parent and child. Julia Patton Hester became feeble with age about this time, and from the year 1939 on Lillie Hester bore the burden of a woman's work in all the household affairs.

Do the foregoing facts establish such a relationship between Lillie Hester and the insured as would warrant the Court in concluding that Lillie Hester stood in loco parentis to the insured for more than one year prior to his entry into the Army? It must be remembered that Lillie Hester claims the proceeds of this insurance, not as a designated beneficiary, but under the distribution provisions of the statute; and therefore the reasons which many courts have given for construing the term "in loco parentis" liberally in order to carry out the wishes of the insured are not applicable here. In a case such as this the common law meaning of the term must be given effect, and the claimant must qualify, if at all, according to the strict standards of the common law. It is essential, if one is to be regarded as in loco parentis to a child, that he must have put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, with the result that his rights, duties and liabilities are the same as those of a lawful parent.

The mutual conduct and relationship between Lillie Hester and the insured, during the time in which Gordon Hester, Jr., lived in the home of his grandmother, did not extend beyond what is ordinarily and customarily observed between an aunt and a nephew in like situations. No intention appears to have existed on the part of either that she should assume any parental obligations towards him, or he any filial duties towards her. In fact, she herself testified with reference to that, on being questioned by the Court, as follows:

"Q. What was your intention with reference to this boy's future care, if any? Did you have any intention of continuing to support him? A. Well, if he had lived and come back from the Army, probably he and I would have lived on together. I don't know. He wrote that he was going to reenlist. I don't know what his intention was. * * *

"Q. Well, what was your intention about that? You said 'probably' it might have happened. A. Well, I hadn't planned anything on the future after mother's death."

From all the testimony, I conclude that Lillie Hester did not at any time bear the relationship of a person in loco parentis to Gordon Hester, Jr.

It seems to be the view of counsel for Lillie Hester that it is necessary, with reference to a child, that there exist at all times both a paternal and a maternal parent, or some one occupying each relationship. I do not agree with this view. There may be two persons, one male and one female, who are in loco parentis to a child, or there may be only one of these, or there may be neither, depending on the particular circumstances of each case. This boy's father, although not legally married to the mother, remained in the home with him for several years, until the father's death only a few months before the boy entered the Army. During this time the evidence is clear that the father himself occupied the relationship of a person in loco parentis to the boy. It does not follow that, because the boy's mother left the home in 1939 and did not afterwards return, some other woman in the home must necessarily have fallen into the relationship towards the boy of loco parentis. Whether or not the grandmother ever occupied that relationship is a question that need not be decided here, although if it were to be decided, the fact that she was the designated beneficiary would be of considerable weight, and might lead to the sustaining of her claim, were that now before the Court, by the application of a liberal interpretation of the term "in loco parentis." Certainly the facts point as strongly to the grandmother as they do to the aunt as a person in loco parentis, and I

do not believe that two women in the home could sustain that relationship towards the boy at the same time.

It remains to be decided which of the other claimants are entitled to the proceeds of the insurance.

■ There is no indication that plaintiff ever intended to sever or relinquish any of the maternal ties which bound her to insured. It may have been that the necessity of her living elsewhere in order to obtain employment and thus provide for the support of her two daughters was the underlying reason for her having left the Hester home in 1939. It was a small place and the income provided from the work which various members of the family were able to get probably did not suffice for their needs. It is also possible that friction may have occurred between her and Gordon Hester, Sr., or between her and the Hester family, although there is no evidence of any such difficulty. It was within less than four years after her leaving the Hester home that her son entered the Army. She had returned before and taken up her maternal duties to him after a much longer absence, and there is no reason to suppose that she did not intend to continue the maternal relationship in the future. In fact, as already shown, her desire at the time she left the Hester home in 1939 was to continue it by taking her son with her.

In the case of Strunk v. United States, D.C., 80 F.Supp. 432, 435, recently decided in the Eastern District of Kentucky, a very similar question was presented as to conflicting claims between the father of the deceased insured and the insured's half-brothers and half-sisters. In that case Judge Ford made the following observations, which I believe correctly express the law of this case:

"Obviously a grandfather may assume the care and custody of his grandchild under circumstances entirely consistent with the continued existence of the natural relationship between the father and the child and without the slightest purpose or intention to sever the natural paternal relationship of the father.

"Since all the rights of the grandfather (who had been named by the insured as beneficiary) to the insurance here involved are precluded by the fact that he died before the death of the insured, it is unnecessary to determine what his rights might have been had he survived.

"The death of the grandfather terminated whatever parental relationship subsisted between him and the insured and removed whatever effect it had in supplanting or superseding the rights of the plaintiff as the natural father.

"The assumed parental relationship of the grandfather affected the natural relationship of the plaintiff only during the life of the grandfather. Upon his death, all rights of the plaintiff, the only living parent of the insured, were revived."

The only distinction which I can trace between the situation in the Strunk case and that which confronts us here is that in the Strunk case the grandfather-beneficiary died before the death of the insured; while in this case the grandmother-beneficiary died after the death of the insured. This slight factual difference does not affect the legal result in the instant case. Even if we assume that the rights of the plaintiff as a natural parent were for a time superseded by those of the grandmother, standing in loco parentis to her grandson, yet at the grandmother's death, plaintiff's rights were revived. She being the only living parent, and never having relinquished her parental rights or obligations, she is entitled to claim the insurance benefits.

An order may be entered in conformity with this opinion, awarding the proceeds of the insurance policy to the plaintiff, Lula Belle Mansfield.